**In re Patricia A. ROWELL, Debtor.**

**No. BKY 09–31129.**

United States Bankruptcy Court, D. Minnesota.

Dec. 15, 2009.

*1 Potato 2, Inc.,* 182 B.R. 540 (Bankr.D.Minn. 1995).

Ian Ball, Minneapolis, MN, for Debtor.

ORDER RE: DEBTOR'S OBJECTION
 TO CLAIM OF INTERNAL REVE-
 NUE SERVICE (CLAIM NO. 1–3)
 AND CONFIRMATION OF DEBT-
 OR'S SECOND MODIFIED PLAN

GREGORY F. KISHEL, Bankruptcy Judge.

This Chapter 13 case is before the Court on two proceedings, the Debtor's objection to the claim of the United States Department of the Treasury, Internal Revenue Service ("IRS") (filed proof of claim no. 1–3) and the IRS's objection to the confirmation of the Debtor's second modified plan. The Debtor appeared by Ian T. Ball. The IRS appeared by David L. Zoss, Assistant United States Attorney, and Dorotha M. Ocker, Trial Attorney, Tax Division, United States Department of Justice. Margaret H. Culp appeared for the Standing Trustee. The following order memorializes the disposition of both proceedings.

## INTRODUCTION

The Debtor filed a voluntary petition under Chapter 13 on February 26, 2009. At the same time, she filed her statements and schedules for this case and a plan of debt adjustment.

On her Schedule A, for real property, the Debtor recited that she owned "NONE." On her Schedule B, she noted interests in several types of personal property, with the following stated values:

| | |
|---|---|
| Bank Account, at TCF Bank | $ 100.00 |
| "HOUSEHOLD GOODS" | $4,000.00 |
| "WEARING APPAREL" | $2,000.00 |
| "EMPLOYER 401(K) PLAN" | "Indeterminate" |
| "2000 KIA SEPHIA 4–DR" automobile | $4,000.00 |

On her Schedule D, the Debtor recited that she had no creditors holding secured claims to report. On her Schedule E, for unsecured priority claims, the Debtor noted a claim in favor of the IRS. She stated its amount as $18,507.00, and the consideration for the claim as "INCOME TAXES 2003–2008." She identified the full stated debt as the amount entitled to priority.

On March 4, 2009, the IRS filed a proof of claim, asserting that the Debtor owed it a total of $18,827.21. It broke down this amount into components for a secured claim (attributed to the Debtor's personal income tax liability for tax years 2003–2005); an unsecured priority claim (attributed to the Debtor's personal income tax liability for tax years 2005–2008); and a general unsecured claim (attributed to penalty and interest on a portion of the liabilities classified under the other categories). On March 12, 2009, the IRS amended its original proof of claim, slightly reducing the stated amount of its unsecured priority claim.

On April 2, 2009, the Debtor filed a modified plan. The IRS timely objected to the confirmation of that plan. On May 27, 2009, the Debtor filed a second modified plan. The IRS maintained a continuing objection to confirmation. The final submission of the issues on confirmation was deferred to allow the Debtor to formally object to the IRS's filed claim.

On June 3, 2009, the IRS further amended its claim. The effect was to ad-just the total stated amount and two of the component debts, by nominal amounts.

On July 21, 2009, the Debtor filed an objection to the IRS's claim.

After that, various hearings were held; the parties filed briefs on the IRS's objection to confirmation; and the Court received evidence and argument on the Debtor's objection to the IRS's claim. The record was closed on both proceedings.

## NATURE OF PROCEEDINGS AT BAR

Of the two matters at bar, the contested confirmation proceedings came first in time. In objecting to confirmation, the IRS raised two issues. The first went to the Debtor's substantive treatment of its claim; the second went to other content of the Debtor's plan, not directly related to the IRS's pre-petition claim.

The Debtor's claim objection was an offshoot of the dispute over the proposed treatment of the IRS's claim in the Debtor's plan. By objecting to the claim, the Debtor sought to have its secured status and priority judicially altered from that asserted on the filed proof of claim; as the Debtor would have it, a properly-allowed claim in favor of the IRS would dovetail with the proposed treatment under her plan. This outcome would meet part of the IRS's objection to confirmation.

## DISCUSSION

The claim objection raised issues of fact, so the Debtor's testimony and an exhibit were received into evidence. The issues posed there will be treated first.

### I. The Debtor's Objection to the IRS's Claim.

The Debtor seeks to have the IRS's claim denied secured status entirely, and to have it allowed solely as a general unsecured claim. In briefing, her attorney pre-

sented two theories for this request.[1] When the matter got to the evidentiary hearing, however, the Debtor's presentation appeared to contemplate an alternate outcome: a direct application of the principles of 11 U.S.C. § 506(a) toward a further splitting of the IRS's claim based on a de facto value of any assets against which it had a valid statutory lien. Though counsel never pointedly argued for this, the whole thrust of the Debtor's evidentiary presentation posed it as a third alternative for relief in her favor.

### A. The Debtor's Contentions with the IRS's Proof of Claim.

The first prong of the Debtor's claim objection goes to the facial content of the IRS's proof of claim. In the last amendment (that filed on June 3, 2009), the IRS asserted a claim in a total of $18,671.66. The total had three components:[2]

1. a secured claim in the amount of $10,100.27 (acknowledged at hearing to actually be $10,100.00), attributed to taxes owing for tax years 2003–2005 with stated interest and penalties;[3]

2. an unsecured priority claim in the amount of $7,466.43, attributed to taxes owing for tax years 2005–2008 with stated interest and penalties;[4] and

3. a general unsecured claim in the amount of $1,104.96, attributed to "[p]enalty to date of petition on unsecured priority claims (including interest thereon)."

In the section of the proof of claim for further data relating to the secured claim, the IRS gives "*All of debtor(s) right, title and interest to property—26 U.S.C. § 6321,*" as the description of the property serving as its security. The form's blank under that for "Value of Property" has no added content. The blank below for "Amount of Secured Claim" is completed with the figure of $10,100.27, however.

■ The Debtor's counsel takes extremely strong exception to this part of the IRS's proof of claim. He insists that it is so deficient that it cannot support the allowance of any secured claim at all. His argument has two focuses: the generic identification of the property to which the IRS asserts a statutory lien under the Internal Revenue Code, with the lack of any more specific description by type of asset; and the lack of a recitation for the value of the claimed security. As a general matter, he urges that "strict compliance with all filing requirements" for a creditor's claim, "at the beginning of the process," be imposed as the standard for triggering the prima facie validity to be given to the recitations of a proof of claim under FED. R. BANKR. P. 3001(f).[5] He insists

---

1. In his briefing, the Debtor's counsel cited no case law in support of either of his theories.

2. A year-by-year breakdown of the three components was set forth in a "Form 10 Attachment" to the proof of claim, and an appended "Federal Facsimile Tax Lien Document."

3. The 27–cent discrepancy was attributed to a mathematical error on the part of IRS personnel.

4. The overlap between the two components for tax year 2005 was actually stated as a division of the liability for that year; the principal amount of the tax due plus the penalty were assigned to the secured claim, and the pre-petition interest accrual to the priority claim.

5. This rule provides:

 A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.

that the IRS's submission was so defective as a memorialization of a secured claim that its claim should be permanently deprived of all secured status for this case.

Frankly, counsel's position on the matter of a standard is overkill, and it ignores federal rule and local case law alike.

■■■ The text of Fᴇᴅ. R. Bᴀɴᴋʀ.P. 3001(a) itself militates against the hypertechnical approach counsel urges, i.e., the infliction of terminal consequences on a claim for the failure to fill in one blank:

> A proof of claim is a written statement setting forth a creditor's claim. A proof of claim *shall conform substantially* to the appropriate Official Form.

(emphasis added). The courts construe the second sentence of this rule according to its plain meaning: to meet muster as an assertion of a claim, a proof of claim need only "conform substantially" to the official form, "[it] need not conform exactly." *In re Dove–Nation,* 318 B.R. 147, 151 (8th Cir. BAP 2004). Where a proof of claim describes a creditor's claim with reference to its components and their specific dollar-amounts, attaches summaries and breakdowns of each debt, and otherwise embodies a bona fide effort to follow the prescriptions of the official form, it "complie[s] with the spirit of the applicable rules" and is to be given prima facie evidentiary effect

as provided in Fᴇᴅ. R. Bᴀɴᴋʀ.P. 3001(f). *Id.* at 152.

■■■ When *Dove–Nation*'s more realistic rule of thumb is applied, with common sense as that opinion suggests, counsel's argument for a zero-tolerance standard has to fail.[6] To assert its secured status, the IRS relied on the breadth of its statutory lien; and under 26 U.S.C. § 6321, the lien does indeed "reach every interest in property that a taxpayer might have." *United States v. Nat'l Bank of Commerce,* 472 U.S. 713, 720, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985); *In re Gran,* 964 F.2d 822, 828 (8th Cir.1992). Since the IRS's secured rights were delimited by a statute, and as broadly as provided there, it had no obligation to recite the specific assets owned by the Debtor, on which it based its assertion of a secured tax claim for this case. As a creditor in bankruptcy, the IRS had a lien on everything the Debtor owned as of her bankruptcy filing, and the Debtor was bound to the operation of that statute for the purposes of this case, absent a substantive provision of bankruptcy law that could displace it. *Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 20, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000) ("creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation …").[7] *See also, in general, In re*

---

6. In oral argument, the Debtor's counsel relied heavily on *In re DePugh,* 409 B.R. 84 (Bankr.S.D.Tex. Jun.26, 2009). Apart from the fact that *DePugh* is an opinion of a judge of a trial court in another federal circuit, and hence has no precedential effect here, the text on which counsel apparently relies, the sentence that spans 409 B.R. at 97–98, does not really articulate the standard urged here. In addition, the sheer length of *DePugh*'s analysis, the repetitiveness of much of its text, and the relative vehemence of its language make it clear that the judge there was not only facing an issue much different from the one at bar, but a problem that he perceived as systemic. That does not seem to be the case here, at all.

7. *In re Immerfall,* 216 B.R. 269 (Bankr. D.Minn.1998) came up in the legal argument for this matter; and since *Immerfall* could be read to impose more exacting requirements on a creditor's proof of claim, it should be discussed. The source of the lien in the present case, in a statute of general application, distinguishes this matter from *Immerfall. Immerfall* involved a retailer's assertion of secured status, purportedly obtained via a consensual security interest in consumer goods purchased through the use of a revolving charge account. The retailer's failure to attach a copy of an executed security agreement to its proof of claim deprived the proof of

*Voelker*, 42 F.3d 1050, 1052 (7th Cir.1994) (recognizing that pre-petition federal tax lien attached to all of debtor's assets, and that, in context of Chapter 13 case, "the lien simply determines the amount he has to pay the IRS").

In context, counsel's other contention with the face of the IRS's proof of claim is only technical, and not material. Yes, the IRS failed to state a "Value of Property" in the blank for that information on the general form for its proof of claim. Clearly, in context this blank is intended to focus the creditor's attention on the operation of 11 U.S.C. § 506(a), and to enable any party reviewing the claim to ascertain the basis for the creditor's stance under that statute.[8] Any prejudice resulting from the lack of that individual quantum of information was de minimis, however; the IRS evinced a process of calculation by completing the later blank for "Amount of Secured Claim" with the figure of $10,100.27. That figure is certainly less than the aggregate amount of the IRS's stated claim; and since this was a creditor that regularly participated in bankruptcy cases, it could be fairly presumed to have applied § 506(a) knowingly. The other blank in the same section would logically go to the calculation under § 506, and the response there appears to have been an error under the apparent theory of the IRS's analysis. However, looking at the proof of claim as a whole, that too was de minimis.[9] Those are the main items, one an act and one an omission, on which the Debtor's counsel accuses the IRS of creating prejudicial indeterminacy and confusion in the way it described its secured claim.

Counsel impugns the IRS on one other point, the assignment of $10,100.00 to the value of the secured claim. It is uncontroverted that IRS personnel arrived at this number by referring to the Debtor's asset schedules for this case, taking the total of the values she had assigned to all of the

---

claim of prima facie evidentiary effect, opening it to objection by the debtor. When the creditor failed to produce an executed security agreement after the debtor objected to its claim, and could not provide an explanation for its failure, the claim was denied secured status and was allowed as a general unsecured claim. The difference between a voluntarily-granted security interest under Article 9 and a statutory lien of all-encompassing scope is pivotal, as to the creditor's burden to support its secured status in its proof of claim.

8. In pertinent part, § 506(a)(1) reads:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property ...

This provision bifurcates a claim for which security is held, into a secured portion and an unsecured portion, with reference to the actual value of the security. *E.g., Associates Comm'l Corp. v. Rash*, 520 U.S. 953, 961, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 238–239, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Harmon v. United States*, 101 F.3d 574, 578–579 (8th Cir.1996).

9. The blank in question here is next to "Amount of Secured Claim," and is for "Amount Unsecured." The figure of $1,104.96 was inserted there. Reference to the "Form 10 Attachment" to the IRS's proof of claim suggests the error; the figure of $1,104.96 is identified to "Penalty to date of petition on *unsecured priority* claims." (emphasis added). Under the detailed breakdown of the attachment, that figure ties to the priority claims asserted for tax years 2005–2008, and not to the secured claims for tax years 2003–2005. So, this component debt apparently had no relevance to the secured claim, and should not have been recited in the section going to a secured claim.

assorted personalty she listed as her property. It is also uncontroverted that IRS personnel followed the IRS's Internal Revenue Manual in doing this.[10]

█ The Debtor's counsel insinuates that there was something untoward in doing this, something that somehow did not comport with the spirit of § 506(a) and Rule 3001. However, he is off-base. When a governmental creditor is the beneficiary of a statutory lien that extends to the most modest and personal of personalty, knowledge of the value of such assets is uniquely within the control of the taxpayer-debtor; and the governmental creditor is within its rights in initially relying on the debtor's statements of that value, as made for the initial bankruptcy filing. *Cf. Raleigh v. Illinois Dept. of Revenue*, 530 U.S. at 21 and n. 1, 120 S.Ct. 1951 (recognizing "the taxpayer's readier access to the relevant information" as one of the "compelling rationales" supporting imposition on taxpayer of burden of proof under non-bankruptcy law, on issue relating to tax liability). The propriety of such reliance, at least for an initial staking of position, is underlined by the duties of accuracy and completeness in bankruptcy schedules that the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8 ("BAPCPA"), underlined via the attorney-certification provisions of 11 U.S.C. §§ 707(b)(4)(C)-(D). And, though counsel impugns the IRS for not having identified its theory and the source for the valuation on the face of its proof of claim, this is not prejudicial. The specifics of the IRS's approach are readily accessible to all members of the public.[11] A simple cross-referencing between that and the entries that a debtor's own counsel has already put into the schedules should reveal the rationale behind an IRS valuation of its secured claim. In any event, a lawyer experienced in representing debtors will become well-acquainted with the approach of a creditor, like the IRS, that is ubiquitous on the Chapter 13 docket.

Those were the only points that the Debtor raised on the first prong of her argument. None of them make out a sustainable objection to the secured component of the IRS's claim, as it appears on the face of its proof of claim. The IRS is entitled to have prima facie evidentiary effect attached to its recitations as to the amount of its secured claim, for all purposes including treatment under the Debtor's plan.[12]

---

**10.** In this set of prescriptions for IRS personnel, the calculation of secured claims in a taxpayer's bankruptcy case is treated under the following relevant language:

Secured Claim

1. *Secured.* The Service may assert a secured claim for taxes, penalties, and interest under IRC § 6321. A tax debt is secured by an NFTL or by setoff.

2. *Notice of Federal Tax Lien.* A valid prepetition NFTL attaches debtor's property, whether real or personal, and includes exempt/abandoned property listed in the debtor's schedules filed with the court.... The IRS's secured status is limited to the debtor's equity under 11 USC § 506(a). Property excluded from the bankruptcy estate under § 541(c)(2) ... cannot be included in determining the amount of the Service's secured claim ...

Note:

Under 11 USC § 506(a)(2) for Chapter 7 or 13 individual bankruptcies filed on or after October 17, 2005, the value of personal property securing the claim is determined based on the replacement value of the property as of the petition date without deduction for costs of sale or marketing.

Internal Revenue Manual § 5.9.13.19.2 (May 20, 2008) *available at http://www.irs.gov/irm/part 5.*

**11.** This via the Web access noted *supra* at n. 10.

**12.** Because this theory presented solely a legal issue, it is not necessary to get into the

## B. The Debtor's Purported Tender of Security.

■ The second prong of the Debtor's claim objection was initiated by her counsel, in a communication to the IRS on May 29, 2009. In a letter of that date, counsel purported to tender all of the Debtor's personal property to the IRS, in satisfaction of its secured claim—every last piece of clothing, every last little item in her apartment.

It is uncontroverted that the IRS refused to accept the tender. And, the IRS has insisted on the allowance and payment of a secured claim via the Debtor's performance under a confirmed plan, as the sole realization on account of its rights as a statutory lienor.

In a summary fashion, virtually by tautology, the Debtor's counsel insists that "the value of the tax lien must be found to be zero," because the IRS refused to accept the assets in which it claimed a statutory lien. He cites no authority in statute or case law for this argument.

■ One is nonplussed by the maintenance of this theory. In the first place, it is out of context, statutorily and procedurally. The thought here might be based on 11 U.S.C. § 1325(a)(5)(C); as one of the alternatives for a plan's treatment of an allowed secured claim, that statute provides for "the debtor surrender[ing] the property securing such claim to [the] holder" of the secured claim. If that was the

linkage, this source of law does not apply in the context of a claim objection. Here, the issue is the viability of the claim in itself, not how it may be treated later under a plan. As to that viability, the consideration is whether "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1).[13] The surrender of collateral under § 1325(a)(5)(C) is a *modification* of the rights of the holder of a secured claim, which is permitted as part of the contents of a plan, 11 U.S.C. § 1322(b)(2), but which is legally enabled only through confirmation of that plan. The satisfaction of the secured component of a claim via such a surrender is not to be obtained by objecting to the claim itself, pre-confirmation.

■ The Debtor's second modified plan does not treat the IRS's secured claim via § 1325(a)(5)(C).[14] However, if it did, a vitiation of secured status through surrender of collateral is not available against a federal tax lien, through the Chapter 13 process in the manner proposed by the Debtor. *In re White*, 487 F.3d 199 (4th Cir.2007) (because wearing apparel, fuel, provisions, furniture, and personal effects up to $6,250.00 in value are statutorily exempt from involuntary seizure under administrative levy in enforcement of a federal tax lien, Chapter 13 debtor's proposal to surrender group of such items in partial satisfaction of IRS's secured claim under

burden-shifting analysis outlined in Eighth Circuit precedent, e.g., *In re Brown*, 82 F.3d 801, 805 (8th Cir.1996) and *In re Gran*, 964 F.2d at 827–828.

13. As noted earlier, the reference point for that enforceability is the law that governed the claim outside of bankruptcy. *Raleigh v. Illinois Dept. Of Revenue*, 530 U.S. at 20, 120 S.Ct. 1951. Here, the "applicable law" would be the provisions of the Internal Revenue Code that govern federal tax liens, al-

though 11 U.S.C. § 506(a) and those portions of the Bankruptcy Code and rules that govern the procedures for allowance of claims could constrict the scope of the creditor's financial rights that were attendant to lienor status.

14. Instead, it gives the customary treatment for a secured claim, retention of the lien pending payment of the stated amount of the allowed secured claim, 11 U.S.C. § 1325(a)(5)(B).

tax lien would not constitute surrender of collateral qualifying as a treatment under § 1325(a)(5)(C)).

As noted at some length in the opinions out of the *White* case, from the Fourth Circuit and the district court, there is nothing logically inconsistent about recognizing the IRS's secured status under a tax lien against personal property of nominal value, and essentially compelling a debtor to a compelled buyback by barring the use of a forced surrender. The lien, once attached, would not be enforceable by administrative seizure outside of bankruptcy; and the IRS should not be compelled in Chapter 13 to go through the longer and more costly remedy of judicial enforcement of its tax lien against items that have only nominal value to any third party. *United States v. White*, 340 B.R. 761, 764 (E.D.N.C.2006); *In re White*, 487 F.3d at 206–207 and n. 7.

The Fourth Circuit was accurate in characterizing this sort of ploy as "vacuousness." 487 F.3d at 207 n. 7. Using it in this case brought forth arguments that were foolish in their implications—and they came from both sides.[15] There is no basis to deny secured status to the IRS's claim, because it would not respond to the Debtor's counsel's ploy.

### C. Determination of Secured Status of IRS's Claim.

By the time of the evidentiary hearing, the Debtor's claim objection veered over to a third prong: adjustment of the amount of an allowed secured claim for the IRS, via a determination of the value of any property to which its lien would continue to attach post-objection. As her attorney acknowledged in final argument, this was a fallback position. In its written submission, the IRS had already conceded that its secured claim could not "in any event exceed the unencumbered value of the Debtor's assets," given the operation of § 506(a).[16]

This set the stage for the determination of the value of the Debtor's clothing, household goods, personal effects, and auto. These things were her only property of any conceivable value. IRS personnel had assumed that they were the only encumbered assets when they asserted a secured status on the IRS's proof of claim.

■■■ With the recitation of value in the IRS's proof of claim given the evidentiary weight of a prima facie case, the Debtor had the burden of production of evidence to rebut that. *In re Brown*, 82 F.3d at 805; *In re Gran*, 964 F.2d at 827; *In re Dove–Nation*, 318 B.R. at 152; *In re*

---

**15.** It was fatuous, and even demeaning, for the Debtor's counsel to base a whole strategy on the prospect of his client dropping every last thing she used to sustain life, including all of her clothing, at an IRS office, and walking away. The word "bluff" fairly screamed from the proposal. On the other hand, the IRS felt compelled to counter-argue that the Debtor could not possibly meet the feasibility requirement of 11 U.S.C. § 1325(a)(6), because she had to have her clothing and personal effects to be able to appear at any job from which she would generate income to fund her plan. That argument presented the largest entity to be a creditor in the federal bankruptcy system, the United States of America itself, insisting that its administrators knew better for

its taxpayer-debtor than the debtor herself did. It also ignored the obvious, that the Debtor had to have a hedge in the form of interim assistance from family and friends, for refuge in the unlikely chance that the IRS accepted her attorney's ploy.

**16.** To the IRS's credit, its attorney did not raise a perfunctory argument based on estoppel or the like. Since the IRS's claim was always subject to the possibility of objection, and its personnel clearly put little effort into the preparation of the proof of claim, it would be hard to identify a material change of position or other prejudice, to make out the reliance element of judicial estoppel.

*Waterman,* 248 B.R. 567, 571 (8th Cir. BAP 2000); *In re Consumers Realty & Dev. Co.,* 238 B.R. 418, 422 (8th Cir. BAP 1999). *See also In re Be–Mac Transport Co.,* 83 F.3d 1020, 1025 (8th Cir.1996). As to the content of her asset schedules (the information on which the IRS's personnel had relied in valuing its secured claim), the Debtor testified that she "took an estimated guess as to what [her] property [was] worth," when she had given her attorney the data for her bankruptcy filing. But, in preparation for the hearing on her claim objection, "when [she] did [her] research, [she] found out [her] property [was] not worth anything." Her investigation included attending garage sales and visiting Goodwill stores, to determine the sale prices of comparable items of older, much-

used clothing, household goods, and furniture.[17]

■■■ Much of the Debtor's testimony about her extrinsic sources was brought out on cross-examination by the IRS's counsel.[18] To the extent it came in on direct examination, there was no objection. Uncontroverted, and credible enough, the evidence would support a finding that the personalty the Debtor owns, other than her automobile, is worth no more than $1,630.40.[19] This is the amount for which this property could be sold at a garage sale, or via consignment at a second-hand store.[20]

Both sides contemplated that the value of the Debtor's automobile should also factor in, as an asset encumbered by the IRS's lien.[21] The Debtor testified, again

---

**17.** The Debtor testified, without controversion, that she had inherited much of her furniture from her deceased parents; that much of her clothing was a decade old or more; that she purchased cleaning implements and kitchen utensils inexpensively, if she had not received them from her parents; and that all of this was hard-worn, exposed to the effects of smoking in her parents' home and her apartment, and often tattered, scratched, or marred.

**18.** This included some hearsay, but counsel brought it right into the record.

**19.** This figure is determined by adding the subtotals for categories of assets on Debtor's Exhibit 1. The Debtor gives a different total herself, at the end of the Exhibit. It is not clear where she derived this.

**20.** In closing argument, the IRS's counsel urged that a valuation commensurate to the retail price for brand-new items of comparable identity and quality, as might be obtained at a store in the Target or Walmart chains, was the appropriate measure under 11 U.S.C. § 506(a)(2). Apparently this argument was based upon the statutory directive to determine value "based on the replacement value of such property as of the date of filing of the petition without deduction for costs of sale or marketing." Section 506(a)(2) was added to § 506(a) by BAPCPA, § 327, 119 Stat. 23, 99–

100 (2005). The enacting Congress's use of the term "replacement value" was none too precise; the same paragraph includes the following language:

> With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

That provision clearly bars the use of current pricing for brand-new equivalents of items of used personalty. As evidenced by this case, it makes problematic the identification of a relevant "retail merchant." As she testified, the Debtor concluded from her "research" that a second-hand store or Goodwill simply would not accept much of what she owned, for resale, because its condition was so defective. Since the host of a garage sale might not be a "retail merchant" under this statute, the Debtor's use of that source for valuation was probably a gratuitous (if small) concession to the IRS. On the record, and in response to the IRS's final argument, the Court rejected the standard urged.

**21.** It was clearly a component in the IRS's calculations, which used only the four classes of scheduled and valued assets noted *supra* at pp. 1 and 12. As his client's concessionary

without challenge, that the value of her 2000 Kia Sephia was only $500.00. She based her opinion-as-owner on the advice of a person she consulted at a single local, small dealer in used automobiles. He apparently considered the auto's origin, make, advanced state of deferred maintenance, and very beat-up condition.

The Debtor's evidence met her shifted burden of production on the issue of value, and because it was substantial, i.e., based on real-life experience, it negated the attribution of presumptive validity to the recitations of the IRS's proof of claim. The burden of production then shifted to the IRS. *In re Gran,* 964 F.2d at 827 (if objection produces "evidence rebutting the claim," claimant has burden of producing additional evidence and must prove validity of claim by preponderance of all of evidence in order to prevail). The IRS did not produce any evidence. As a result, the Debtor's evidence, having sufficient weight and probity, supports a finding on the value of the IRS's security. That finding is now made, at the amount of $2,230.42.[22]

By application of § 506(a), the amount of the IRS's secured claim, based on the Debtor's tax liability for 2003–2005, is $2,230.42. The balance of the claim traceable to those years, $7,869.58, is unsecured. The component of the claim for tax year 2005 ($2,415.50) is entitled to priority status under 11 U.S.C. § 507(a)(8)(A)(i), joining the interest component of that year's liability that the IRS previously classified with priority.[23] The balance of the component classified by the IRS as secured ($5,454.08), is to be allowed as a general unsecured claim for this case.

*Outcome.*

The Debtor sought to relegate the full amount of the IRS's claim to general unsecured status. The theories her counsel originally briefed were tersely-presented, thin on their face, and ultimately without merit. The late-coming invocation of § 506(a) had merit, to the extent that the Debtor's evidence warranted.

However, the outcome in the Debtor's favor on that theory affected only the one component of the IRS's claim. When the record was closed, there was no basis in evidence and no articulated legal theory on which to subordinate the previously-asserted priority-claim component to a general unsecured status. Counsel never restricted the sweeping scope of the relief he demanded for his client, but he never met his client's initial burden of production for it either. So, there was no sustainable objection as to the priority-claim component. *In re Gran,* 964 F.2d at 828 (when taxpayer-debtor introduces evidence to counter taxing authority's proof of claim, burden of production of evidence shifts to government only as to those elements of claim that taxpayer-debtor has challenged with evidence).

The rulings above give the parties a configuration of the IRS's rights as claimant in this case. It is now up to the Debtor, as to what to do with it.

## II. The IRS's Objection to Confirmation of the Debtor's Second Modified Plan.

 When they structured their positions on confirmation, neither side antici-

---

position, the Debtor's counsel built a $4,000.00 secured claim into the plan, to match to the scheduled value of the Debtor's automobile.

**22.** This includes the $100.00 on deposit with a financial institution.

**23.** The Debtor filed for Chapter 13 on February 26, 2009. Her return for tax year 2005 would have been last due on or after April 15, 2006, "after three years before the date of the filing of [her] petition" as the statute prescribes for priority status.

pated a result of the sort just reached. More to the point, the Debtor did not structure her plan consistently with this specific classification and liquidation of the components of the IRS's claim. Thus, the second modified plan, as such, cannot be confirmed. The two simplest reasons go back to the results of the claim allowance:

A. The Debtor provides for a secured claim in favor of the IRS in the amount of $4,000.00. This does not reflect the amount of that component as allowed.[24]

B. The plan provides for a priority claim in favor of the IRS, in the amount of $7,112.00, which does not reflect the uncontested (and hence allowed) amount of that component, $7,466.43, plus the additional amount allowed above as a priority claim, $2,415.50, for a total of $9,881.93.

But, there is another issue on plan content, as well as a feasibility-related point, that the Debtor will have to address as a consequence for her personal budgeting in the past. Both result from the Debtor's accrual of unpaid income tax obligations on an annual, incremental basis over a seven-year period, in an average of over $2,000.00 per year. This created the central problem for the Debtor in this case, how to treat the taxing authorities' claims in a fashion consistent with the requirements of bankruptcy law, but still within the limits of her current personal income and means.

The most likely explanation for the regular accrual of these obligations is a systematic, and knowing, under-withholding for income taxes from the Debtor's wages, probably to maximize the take-home from her modest gross income.[25] If that has been her program, it has only deferred her day of reckoning to the taxing authorities.[26] Beyond the legal matter of doing that in this case, the Debtor must take a belated, hard look at how she structures her personal cash flow, and must make some choices.[27]

---

**24.** The Debtor's proposed treatment was advanced in late May, 2009, based upon an assumed value of $4,000.00 for the Debtor's automobile and her attorney's rejection of any other basis for a secured claim through the tax lien. As the evidence came out, that was an unrealistic concentration on the value of the automobile and an overly-dismissive attitude toward the lien on the personalty. This was an odd combination of trying to buy peace, but still going head-to-head with a federal administrative agency that was locked into certain positions by general policy. The Debtor maintained this position through the final session of a confirmation hearing, in late August. Even then, counsel urged that the plan be confirmed, without delay, on the ground that "there would be enough room" within the proposed treatment of a secured component claim to cover any possible outcome on the claim objection. That was an overly simplistic approach to a dispute that had become more complex than the one he had put into motion.

**25.** The Debtor's Schedule I recites that she is employed by American Express, as a travel counselor, with gross monthly wages of $2,875.00.

**26.** It appears that she has had the same approach to her state income tax obligations. Her attorney included a provision in her second modified plan for the payment of a priority tax obligation of $6,513.00 to the Minnesota Department of Revenue.

**27.** In the IRS's objection, counsel outlined an analysis, based on the Debtor's Schedules I and J, of how the Debtor was using this process of under-withholding when she commenced this case, and was likely to continue. This was not evidence, and the IRS did not present any in-court evidence on the point; hence, no specific finding can be made to the effect urged. The much more general finding made is closer to an observation, but one that is undeniable; the IRS's withholding schedules are formulated to avoid just the ongoing impasse the Debtor has made for herself, a

The Debtor's past treatment of her income tax liability clearly motivated the IRS to take a hard line for the inclusion of an additional proviso in her plan, the so-called "tax compliance language" that its attorneys have taken to demanding when they make other substantive objections to confirmation in Chapter 13 cases in this district. For reasons that were not immediately clear at the time, the Debtor's attorney got adamant to the point of shrillness in opposing the IRS's demand.

The "tax compliance language" in controversy, which would be inserted onto the local form plan as paragraph 13, is as follows:

> The debtor will file as and when due any and all post-petition federal tax returns of any kind; and will timely pay as and when due, any and all post-petition federal tax liabilities of any kind. Debtor's failure to file as and when due any and all post-petition federal tax returns of any kind; or failure to timely pay as and when due any and all post-petition federal tax liabilities of any kind, will constitute grounds for dismissal.

There is precious little case law on any legal implication of a taxing authority's demand for the inclusion of such a provision. In his opposition, the Debtor's counsel relies mainly on *In re Corbo,* 391 B.R. 617 (Bankr.D.Minn.2008) (O'Brien, J.). In *Corbo,* Judge O'Brien stated:

> There is no controlling local rule or standing order in this jurisdiction requiring Chapter 13 debtors to file all post petition tax returns when due and to make all post petition tax payments when due ... [T]here is nothing in the provisions of Chapter 13 that mandates

dismissal for a debtor's failure to stay current with post petition tax obligations, any more than a debtor's failure to stay current with any other legal obligations. Without a controlling provision in the confirmed plan or a controlling order or local rule, post petition tax delinquency is not per se cause for dismissal.

391 B.R. at 622.

The Debtor's counsel invokes *Corbo* broadly, for an undifferentiated attack on the full text of the "tax compliance" provision. However, the issue is more nuanced than that. As to the matter of the *filing* of post-petition *tax returns, Corbo* is distinguishable; it came out of a case commenced before the October 17, 2005 effective date of BAPCPA,[28] and one of BAPCPA's amendments speaks quite pointedly to the filing of such returns:

> (1) Notwithstanding any other provision of [the Bankruptcy Code], if the debtor fails to file a tax return that becomes due after the commencement of the case or to properly obtain an extension of the due date for filing such return, the taxing authority may request that the court enter an order converting or dismissing the case.
>
> (2) If the debtor does not file the required return or obtain the extension referred to in paragraph (1) within 90 days after a request is filed by the taxing authority under that paragraph, the court shall convert or dismiss the case, whichever is in the best interests of creditors and the estate.

11 U.S.C. § 521(j).

The Debtor's counsel did not recognize the status of current law by giving a quali-

repeated annual tax obligation imposed after the corresponding income is long-gone.

**28.** The published opinion in *Corbo* does not recite the date on which the case was commenced, but it does note that the plan therein was confirmed on March 10, 2005. 391 B.R. at 618.

fied concession as to the *filing* of post-petition returns. But, there is not much further to be said. The formal provision in a plan for a duty to file such returns might be surplusage as to the existence of the duty; but, there is no real reason to bar the inclusion of an enunciated duty in the plan of a debtor who has been derelict in general taxpayer's obligations, pre-petition.

Perhaps the Debtor's counsel is concerned with the provision for a consequence, i.e., dismissal of the case upon a failure to timely file such returns. That concern is somewhat illusory, given the imposition of the same consequence under §§ 521(j)(1)-(2). The "tax compliance language" might leave a defaulting debtor with nominally less "wiggle room" than under § 521(j)(2), but the concern is eased by a concession made by the IRS's counsel on the record in this case: notwithstanding the connotation of a mandate from the language ("will constitute grounds for dismissal"), the IRS would seek dismissal for default only via motion—and its intention was not to "take away the court's discretion" in entertaining and ruling on a debtor's defense. That presupposes a right in a debtor to present an excuse or other defense. Section 521(j)(1) presupposes the same, in its provision for a moratorium on dismissal pending the belated filing of delinquent returns.

So, it seems, the real contention is with the other duty imposed by the language, *to pay* post-petition taxes *when due* under penalty of dismissal. As to that point, any applicable analysis from *Corbo* is not outdated by BAPCPA's enactment. Current law imposes no specific statutory duty on Chapter 13 debtors to stay current in payment of post-petition tax obligations.

But, *Corbo* is distinguishable anyway, due to the procedural context in which its issues were presented and decided, and Judge O'Brien's specific reliance on that context in enunciating his rulings. The only pending proceeding with a live controversy in *Corbo* was the IRS's motion for dismissal; the debtor had withdrawn the post-confirmation modification he had proposed, so his original confirmed plan was the one in effect. 391 B.R. at 623. That plan did not have "tax compliance language." *Id.* at 622. *Corbo* stands for no more than the proposition that the failure to pay post-confirmation income tax obligations is not a default in plan performance meriting dismissal, where there is no general source of law, local or national, that mandates post-petition "tax compliance," and the debtor has no express duty for that under a confirmed plan. *Id.*

Actually, in dictum Judge O'Brien agreed with the proposition that a debtor's post-petition persistence in a pre-petition pattern of earning income but not timely paying taxes on it, would not be in good faith toward the Chapter 13 process. *Id.* He reached that conclusion under pre-BAPCPA law. Its strength is only reinforced, post-BAPCPA. Clearly, in enacting § 521(j) Congress intended to see that debtors in Chapter 13 did not neglect their general duties as taxpayers. The thought there could not have been solely to dovetail with the new obligation on debtors under 11 U.S.C. § 521(f)(1), to file with the court a copy of all post-petition tax returns upon request by the court, the United States Trustee, or any party in interest. And, from a more general perspective, Chapter 13 debtors now must attend a course of personal financial management, and evidence that attendance of record, as a prerequisite for a grant of discharge. 11 U.S.C. § 1328(g)(1). This reflects a legislative intent, to encourage debtors to make their Chapter 13 filings a true cleaving event for themselves, toward a more sta-

ble, responsible, and sustainable participation in economic life.

In the matter at bar, the lack of good faith is patent, when the resistance to the "tax compliance language" is compared to the very nature of the problem that apparently drove the debtor into Chapter 13, and the prospect that she did nothing to change the structure of her personal finances in order to avoid its repetition. This case presents all too much of a possibility that the Debtor would merely roll her substantial pre-petition tax debts over to an accumulation of new, post-petition ones, while she had the protection of the court but when she ought to be fully enabling a true fresh start for herself. Given the undisputed history, the IRS was well-put to demand the inclusion of "tax compliance language" in any plan to be confirmed here, as an "integrity control" measure toward ensuring the Debtor's good faith. The Debtor cannot satisfy 11 U.S.C. § 1325(a)(3) unless she includes it in any further modified plan.

So, the Debtor's second modified plan cannot be confirmed, because of its substantive treatment of the IRS's claim and its more general content alike.

### Outcome

One is tempted to say that this case did not have to get this complicated; but that might not be entirely fair to the parties. The issues boded real, significant consequences to both sides, and there was precious little guidance in statute or case law. However, the tenor of things did get too inflamed, from pique on one side and a degree of institutionally-driven obduracy on the other.

But now the parties have answers to their questions. It is up to the Debtor to take the next step, to promptly propose a further modified plan in conformity with this order's rulings, if she wishes to deal with the burden of her debts under the protection of this Court. That will have to include a significant adjustment of her withholding, to deal with tax obligations to mature in the future. This, in turn, may affect the amount of income inflow into the plan and the payout to creditors through it. If the Debtor is fortunate, she will still be able to see that her debts are serviced in compliance with Chapter 13's substantive requirements, under the structure of claim allowance in this order. That will come down to mathematics.

### ORDER

On the memorandum of decision just made,

IT IS HEREBY ORDERED:

1. As to the claims of the United States Department of Treasury, Internal Revenue Service, set forth on proof of claim no. 1–3 in this case,

 a. the claims based on the Debtor's tax liabilities for 2003–2005 are allowed as a secured claim in the amount of $2,230.42, a priority claim for tax obligations for 2005 in the amount of $2,415.50, and a general unsecured claim for the balance of tax obligations for 2003–2004 in the amount of $5,454.08; and

 b. the Debtor's objection as to the remainder of the claim set forth on proof of claim no. 1–3 is overruled.

2. The Debtor's second modified plan is not confirmed.

3. No later than *January 14, 2010,* the Debtor shall file a notice of pre-confirmation modification, including a notice of a reconvened confirmation hearing and a modified plan, and shall serve those documents in conformity with Loc. R. BANKR.P. (D.MINN.) 3015–2(a). Counsel for the Debtor shall schedule the reconvened confirmation hearing for *January 28, 2010.*

4. Failure by the Debtor to comply with Term 3 of this order will constitute cause for conversion or dismissal of this case under 11 U.S.C. §§ 1307(c)(1) and (3), upon motion of the Standing Trustee or another party in interest.